**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **CHAIM ILOWITZ**<br>Plaintiff,<br>v.<br>**UNITED WHOLESALE MORTGAGE, LLC**<br>Defendant. | **COMPLAINT FOR DAMAGES**<br>JURY DEMAND ENDORSED HEREON |

Plaintiff Chaim Ilowitz, by and through counsel, states as follows for his Complaint against United Wholesale Mortgage, LLC:

**INTRODUCTION, PARTIES, JURISDICTION, AND VENUE**

1. Plaintiff Chaim Ilowitz ("Plaintiff" or "Ilowitz") is the owner of real property and improvements located at and commonly known as 5706 18th Avenue, Unit 1, Brooklyn, NY 11204 (the "Home").

2. Ilowitz has, at all times relevant, maintained the Home as his primary, principal residence and continues to maintain the Home as such.

3. Defendant United Wholesale Mortgage, LLC ("UWM") is a limited liability company established under the laws of the state of Michigan. UWM services mortgage loans across the United States, including mortgages secured by properties in the State of New York.

4. UWM is the current servicer of a note used to purchase the Home (the "Note") and a mortgage on the Home that secures the Note (the "Mortgage") (hereinafter collectively referred to as the "Loan"). Non-Party Newrez, LLC d/b/a Shellpoint Mortgage Servicing ("Shellpoint") is the predecessor servicer of the Loan.

5. Ilowitz originated the Loan with United Shore Financial Services, LLC on or about May 17, 2019.

6. Shellpoint serviced the Loan since at all times relevant to the allegations contained in this pleading until January 4, 2021, when the servicing of the Loan transferred to UWM.

7. Jurisdiction of claims against UWM is conferred by 28 U.S.C. § 1331, as this action arises under the Dodd-Frank Wall Street Reform and Consumer Protection Act (DFA), the Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601, *et seq*. (RESPA). This action is further specifically filed, in part, to enforce regulations promulgated by the Consumer Finance Protection Bureau (CFPB) that became effective on January 10, 2014, specifically, 12 C.F.R. §§ 1024.35 and 1024.41 of Regulation X of RESPA.

8. This Court has supplemental jurisdiction to hear all state law claims pursuant to 28 U.S.C. § 1367.

9. Venue lies in this District pursuant to 28 U.S.C. § 1391(b) as Ilowitz purchased the Home for his primary residence within the District, UWM does business in this District, and the conduct complained of took place primarily in this District.

## SUMMARY OF CLAIMS

10. In January 2013, the CFPB issued a number of final rules concerning mortgage markets in the United States, pursuant to the DFA, Public Law No. 111-203, 124 Stat. 1376 (2010).

11. Specifically, on January 17, 2013, the CFPB issued the RESPA Mortgage Servicing Final Rules, 78 F.R. 10695 (Regulation X) (February 14, 2013), which became effective on January 10, 2014.

12. The Loan is a "federally related mortgage loan" as said term is defined by 12 C.F.R. § 1024.2(b).

13. UWM is subject to the aforesaid regulations and each does not qualify for the exception for "small servicers", as such term is defined in 12 C.F.R. § 1026.41(e)(4), nor the exemption for a "qualified lender", as such term is defined in 12 C.F.R. § 617.700.

14. Ilwoitz asserts claims for relief against UWM for breaches of the specific rules under Regulation X as set forth, *infra*.

15. Ilowitz has a private right of action under RESPA pursuant to 12 U.S.C. § 2605(f) for the claimed breaches of Regulation X and such action provides for remedies including actual damages, costs, statutory damages, and attorney's fees.

**STATEMENT OF FACTS**

16. As with many other individuals throughout the country, Ilowitz has encountered some economic difficulties with imminent further difficulties. Wanting to keep the Home and desiring nothing more than to remain a responsible mortgage paying citizen, Ilowitz attempted to take the necessary actions to modify the Loan with Shellpoint.

17. As part of this process, on or about December 9, 2020, Ilowitz submitted a loss mitigation application (the "Application") to Shellpoint. A true and accurate copy of the cover letter for this correspondence is attached as **Exhibit 1**.

18. On or about December 21, 2020, Shellpoint contacted Ilowitz to confirm receipt of the Application and advise that it required a letter of explanation in order to complete its review of the Application. On or about December 24, 2020, the Borrower submitted the documents and information requested by and through the December 21, 2020 phone call. A copy of the cover letter for this correspondence is attached as **Exhibit 2**.

19. On or about January 4, 2021, servicing rights to the Loan transferred to UWM and Mr. Cooper. A copy of the servicing transfer notice is attached as **Exhibit 3**.

20. Between December 24, 2020 and March 15, 2021, the Borrower had not received any correspondence from either Shellpoint or UWM concerning the Application.

21. On or about March 15, 2021 Ilowitz, through counsel, sent correspondence to UWM via USPS Certified Mail, return receipt requested [Tracking No.: 70173380000027424790] captioned "Notice of Error pursuant to 12 C.F.R. § 1024.35(b)(11) for failing to comply with the requirements of 12 C.F.R. § 1024.41(k)" ("NOE #1"). A copy of NOE #1 and tracking information evidencing delivery of NOE #1 from the website for the USPS (www.usps.com) is attached as **Composite Exhibit 4**.

22. Through NOE #1, Ilowitz alleged that UWM committed an error in relation to the Loan pursuant to 12 C.F.R. § 1024.35(b)(11) by either failing to exercise reasonable diligence to complete the Application and conduct a review of the same as required by 12 C.F.R. §1024.41(k). See *Exhibit 4*.

23. Ilowitz sent NOE #1 to UWM at the address designated by UWM for receipt of requests for information and notices of error (the "Designated Address"). *See Exhibit 3*, establishing and notifying Ilowitz of the Designated Address.

24. UWM received NOE #1 at the Designated Address on or about March 22, 2021. See *Exhibit 4*.

25. Between March 22, 2021 and April 15, 2021, UWM failed to send correspondence either acknowledging or responding to NOE #1.

26. UWM sent correspondence in response to NOE #1 on or about April 16, 2021 (the "Response to NOE #1"). A copy of the Response to NOE #1 and its enclosures is attached as **<u>Exhibit 5</u>**.

27. Through the Response to NOE #1, UWM claimed that no errors occurred as alleged through NOE #1, further stating:

> In your correspondence you stated the above referenced loan was previously in review for a modification with the prior mortgage servicer Shellpoint Mortgage; ***however, after the transfer to UWM, the modification process has stopped***. After review, UWM determined, we received the prior servicer's modification documents; however, we determined, not all required documents were provided to Shellpoint Mortgage; therefore, additional documents are still required in order to complete the review process. We ***spoke*** with the customer on January 13, 2021, and advised the customer all previously provided documents have not been received and to submit the documents directly to UWM.
>
> We sent correspondence to the customer on January 19, 2021, advising of the delinquency on the account and options that can be provided to the customer as per federal guidelines. Additional correspondence was sent to the customer on January 20, 2021, advising the customer of his assigned Single Point of Contact (SPOC), who can assist him with the delinquency of the loan.[1]
>
> We attempted to contact the customer on April 13, 2021, to discuss the additional documents required for the review; however, he advised he would not speak with a UWM representative and will only listen to you, his attorney Javier L. Merino. Please note, UWM attempted to contact you via phone the same day; however, there was no answer and a voicemail was left. As of the date of this correspondence, UWM has not received a call back from you nor your office to discuss the additional documents required for the modification review. UWM mailed another modification letter to the customer on April 14, 2021, providing a new modification application and list of documents needed, as the documents were not provided and; therefore, the previous modification case was closed.

*See Exhibit 5.*

---

[1] Notably, neither the January 19, 2021 nor the January 20, 2021 letters made any reference to the previously submitted Application.

28. Through the Response to NOE #1, UWM enclosed two (2) other pieces of correspondence dated April 9, 2021. The first was a payoff quote which UWM purported to mail to Ilowitz on or around April 9, 2021. The second was correspondence from UWM which UWM purported to send on or about April 9, 2021 to UWM's counsel (the "Purported RFI Response"). UWM alleged that it provided the Purported RFI Response to Ilowitz's counsel through *both* email (to notices@dannlaw.com) and U.S. Standard Mail. The Response to NOE #1 was the first instance that Ilowitz's counsel was provided with a copy of the Purported RFI Response.[2,3]

29. As UWM refused to acknowledge their error and close out their review of the Application, and as UWM was now demanding that Ilowitz submit a brand new application, Ilowitz was forced to retain and pay counsel to assist him in submitting a secondary Application.

30. On or about February 26, 2021, Ilowitz submitted a request for a payoff statement and a request for the owner, servicer, and sub-servicer of the loan ("RFI #1") to UWM at the Designated Address via Certified Mail to obtain an updated and accurate payoff statement. A copy of RFI #1 and tracking information evidencing delivery of RFI #1 from the website for the USPS (www.usps.com) is attached as **Exhibit 7**.

31. On or about February 26, 2021, Ilowitz submitted a request for information (the "RFI #2") to UWM at the Designated Address via Certified Mail requesting

[2] Curiously, UWM's own email portal for notices@dannlaw.com demonstrates that the *only* email UWM sent to notices@dannlaw.com was the April 16, 2021 email containing the NOE #1 Response. The portal provides no records of the April 9, 2021 correspondence UWM alleged it mailed. A copy of the inbox screenshot is attached as **Exhibit 6**.

[3] The Purported RFI Response also claimed to provide fourteen (14) enclosures. However, the copy of the Purported RFI Response provided in the NOE #1 Response contained zero (0) enclosures.

information pertaining to the Loan, including a transaction history and loss mitigation-related correspondence. A copy of the RFI and tracking information evidencing delivery of the RFI from the website for the USPS (www.usps.com) is attached as **Exhibit 8**.

32. UWM did not respond to RFI #1 on or before March 18, 2021.

33. Since UWM failed to timely respond to RFI #1, on or about April 13, 2021, Ilowitz sent a notice of error ("NOE #2") to UWM at the Designated Address via Certified Mail asserting that UWM failed to: (1) timely acknowledge RFI #1, (2) timely provide an accurate payoff statement; and (3) timely respond to Ilowitz's request for the identity of, and address or relevant contact information for, the owner or assignee of the Loan. A copy of NOE #2 and tracking information evidencing delivery of NOE #2 from the website for the USPS (www.usps.com) is attached as **Exhibit 9**.

34. According to USPS Tracking, UWM received NOE #2 on April 19, 2021. *See Exhibit 9*.

35. On or about April 21, 2021, UWM sent correspondence to Ilowitz in response to NOE #2 (the "NOE #2 Response"). UWM did not make any reference to the errors alleged by and through NOE #2. Instead, UWM provided information regarding the owner and servicer of the loan. A copy of the NOE #2 Response is attached as **Exhibit 10**.

36. Since UWM provided an insufficient response to RFI #2, on or about May 10, 2021, Ilowitz sent a notice of error ("NOE #3") to UWM at the Designated Address via Certified Mail asserting that UWM failed to properly respond to RFI #2. A copy of NOE #3, without supporting enclosures is attached as **Exhibit 11**.

## IMPACT AND DAMAGE

37. UWM's actions in failing to properly respond to Ilowitz's request for information has caused Ilowitz to incur attorneys' fees and costs to attempt to obtain such information and correct such errors.

38. UWM's actions in failing to: (1) properly handle the loss mitigation process for the Loan despite being put on notice of their errors; and (2) properly respond to Ilowitz's requests for information and notices of error has caused Ilowitz to incur attorneys' fees and costs to attempt to obtain information, correct such errors and to submit multiple loss mitigation applications which would have been unnecessary but for UWM's actions.

39. Further, as interest, fees, and costs on Ilowitz's loan have increased during the period UWM has improperly delayed the loan modification process, any modification that Ilowitz would eventually obtain will require an increased monthly payment than would have been otherwise and consist of a higher unpaid modified principal balance upon which Ilowitz will have to pay interest due to amounts that would not have been incurred and capitalized but for UWM's erroneous actions.

40. Also, Ilowitz has suffered great emotional distress driven by the continued fear of losing his Home in foreclosure, which has resulted in anxiety and other mental distress.

**PATTERN AND PRACTICE OF REGULATION X VIOLATIONS BY UWM**

41. UWM's actions are part of a pattern and practice of behavior in violation of Ilowitz's rights and in abdication and contravention of and UWM's obligations under the mortgage servicing regulations set forth in Regulation X of RESPA.

42. At the time of the filing of this Complaint, UWM had at least Five Hundred Eighty-Three (583) consumer complaints lodged against it nationally, specifically

concerning the issue identified on the CFPB's consumer complaint database as "loan modification, collection, foreclosure" related to mortgages. Each such complaint is filed and cataloged in the CFPB's publicly accessible online database. (https://www.consumerfinance.gov/data-research/consumer-complaints/).

43. Ilowitz has reviewed the CFPB's consumer complaint database and has identified other alleged RESPA violations by Shellpoint against other borrowers. In particular, Ilowitz has reviewed the fifteen (15) consumer complaints attached hereto and identified as **Group Exhibit 12**. The date, details, and a narrative disclosed by the consumer is set forth in each complaint. The complaints allege conduct which demonstrates that UWM has engaged in a pattern and practice of violating RESPA with respect to other borrowers.

**COUNT ONE: VIOLATION OF 12 C.F.R. § 1024.41(b) OR 12 C.F.R. § 1024.41(c)(3) AND 12 U.S.C. § 2065(k)(1)(E)**

**(Failure to exercise reasonable diligence in obtaining documents and information to complete the First Application)**

44. Ilowitz restates and incorporates all of his statements and allegations contained in paragraphs 1 through 43, in their entirety, as if fully rewritten herein.

45. 12 C.F.R. § 1024.41(a) explicitly provides that "[a] borrower may enforce the provisions of this section pursuant to section 6(f) of RESPA (12 U.S.C. §2605(f))".

46. A servicer shall not "fail to comply with any other obligation found by the [CFPB], by regulation, to be appropriate to carry out the consumer protection purposes of this chapter." 12 U.S.C. § 2065(k)(1)(E).

47. If a transferee servicer acquires servicing rights to a mortgage loan for which a loss mitigation application is pending as of the transfer:

> [T]he transferee servicer must comply with the requirements of this section for that loss mitigation application within the timeframes that were applicable to the transferor servicer based on the date the transferor servicer received the loss mitigation application. All rights and protections under paragraphs (c) through (h) of this section to which a borrower was entitled before a transfer continue to apply notwithstanding the transfer.

12 C.F.R. §1024.41(k)(1)(i).

48. 12 C.F.R. § 1024.41(b) provides that "a servicer shall exercise reasonable diligence in obtaining documents and information to complete a loss mitigation application."

49. The CFPB's Official Interpretation of 12 C.F.R. § 1024.41(b)(2)(i)(B) provides in relevant part that:

> A servicer must request information necessary to make a loss mitigation application complete ***promptly*** after receiving the loss mitigation application….
>
> Reasonable diligence for purposes of § 1024.41(b)(1) includes, without limitation, the following actions: …
>
> Servicing for a mortgage loan is transferred to a servicer and the borrower makes an incomplete loss mitigation application to the transferee servicer after the transfer; the transferee servicer reviews documents provided by the transferor servicer to determine if information required to make the loss mitigation application complete is contained within documents transferred by the transferor servicer to the servicer…

(emphasis added).

50. The CFPB's Official Interpretation of 12 C.F.R. § 1024.41(b)(2)(i)(B) provides that:

> Even if a servicer has informed a borrower that an application is complete (or notified the borrower of specific information necessary to complete an incomplete application), if the servicer determines, in the course of evaluating the loss mitigation application submitted by the borrower, that additional information or a corrected version

> of a previously submitted document is required, the servicer must promptly request the additional information or corrected document from the borrower pursuant to the reasonable diligence obligation in § 1024.41(b)(1). See § 1024.41(c)(2)(iv) addressing facially complete applications.

Supplement I to Part 1024.

51. Moreover, 12 C.F.R. § 1024.41(c)(2)(iv) provides, in part, that: "[i]f the servicer later discovers additional information or corrections to a previously submitted document are required to complete the application, the servicer must promptly request the missing information or corrected documents and treat the application as complete for the purposes of paragraphs (f)(2) and (g) of this section until the borrower is given a reasonable opportunity to complete the application.

52. On or about December 9, 2020 Ilowitz submitted the Application to Shellpoint. *See Exhibit 1*.

53. On or about December 21, 2020, Shellpoint contacted Ilowitz to confirm receipt of the Application and advise that Shellpoint required a letter of explanation in order to complete its review of the Application. On or about December 24, 2020, Ilowitz submitted the documents and information requested by and through the December 21, 2020 phone call. *See Exhibit 2*.

54. UWM failed to exercise reasonable diligence in obtaining missing or incomplete information and documentation to complete the First Application by failing to promptly contact Ilowitz regarding the Application until April 14, 2021, ***over three (3) months after the service transfer to UWM***.[4]

---

[4] The only loss mitigation-related correspondence UWM sent was a generic letter dated January 19, 2021, which generally invited Ilowitz to submit a brand new application but otherwise made no reference to the already-submitted Application.

55. Due to UWM's failure to exercise reasonable diligence, UWM is now demanding that Ilowitz submit "a new modification application" to UWM. *See Exh #.*

56. Through the Response to NOE #1, UWM alleged "not all required documents were provided to Shellpoint. Instead of simply requesting the missing documents needed, UWM demanded that Ilowiz submit an entirely new modification application. This is insufficient to be reasonably diligent on its own as such now requires Ilowitz to submit a brand new Application.

57. UWM's actions in failing to exercise reasonable diligence in obtaining missing or incomplete information and documentation to complete the Application as expressly required by 12 C.F.R. § 1024.41(c)(2)(iv) and 12 C.F.R. § 1024.41(b), constitutes a clear, separate, and distinct violation of 12 C.F.R. §1024.41.

58. UWM's actions caused Ilowitz to suffer actual damages as further described, *supra*, including but not limited to:

a. Attorneys' fees and postage costs in the sending of NOE #1;

b. Attorneys' fees in retaining counsel to submit a new application;

c. Ilowitz has suffered an unnecessary delay in the rehabilitation of his credit standing due to UWM's delays in reviewing Ilowitz's Application; and

d. Great emotional distress driven by the continued fear of losing his Home in foreclosure, which has resulted in anxiety and other mental distress.

59. UWM's actions are believed to be part of a pattern and practice of behavior in conscious disregard for Ilowitz's rights.

60. As a result of UWM's actions, UWM is liable to Ilowitz for actual damages, statutory damages, costs, and attorneys' fees.

**COUNT TWO: VIOLATION OF 12 C.F.R. § 1024.41(c)(1) AND 12 U.S.C. § 2065(k)(1)(E)**

**(Failure to evaluate complete loss mitigation application within thirty (30) days)**

61. Ilowitz restates and incorporates all of his statements and allegations contained in paragraphs 1 through 43, in their entirety, as if fully rewritten herein.

62. 12 C.F.R. § 1024.41(a) explicitly provides that "[a] borrower may enforce the provisions of this section pursuant to section 6(f) of RESPA (12 U.S.C. §2605(f))".

63. A servicer shall not "fail to comply with any other obligation found by the [CFPB], by regulation, to be appropriate to carry out the consumer protection purposes of this chapter" 12 U.S.C. § 2065(k)(1).

64. If a transferee servicer acquires servicing rights to a mortgage loan for which a loss mitigation application is pending as of the transfer:

> [T]he transferee servicer must comply with the requirements of this section for that loss mitigation application within the timeframes that were applicable to the transferor servicer based on the date the transferor servicer received the loss mitigation application. All rights and protections under paragraphs (c) through (h) of this section to which a borrower was entitled before a transfer continue to apply notwithstanding the transfer.

12 C.F.R. §1024.41(k)(1)(i).

65. 12 C.F.R. § 1024.41(c)(1) provides in relevant part that:

> ...if a servicer receives a complete loss mitigation application more than 37 days before a foreclosure sale, then, within 30 days of receiving the complete loss mitigation application, a servicer shall:
>
> > (i) Evaluate the borrower for all loss mitigation options available to the borrower; and
> >
> > (ii) Provide the borrower with a notice in writing stating the servicer's determination of which loss mitigation options, if any, it will offer to the borrower on behalf of the owner or assignee of the mortgage….

66. 12 C.F.R. § 1024.41(c)(2)(iv) provides:

> (iv) *Facially complete application.* A loss mitigation application shall be considered facially complete when a borrower submits all the missing documents and information as stated in the notice required under paragraph (b)(2)(i)(B) of this section, when no additional information is requested in such notice, or once the servicer is required to provide the borrower a written notice pursuant to paragraph (c)(3)(i) of this section. If the servicer later discovers that additional information or corrections to a previously submitted document are required to complete the application, the servicer must ***promptly*** request the missing information or corrected documents and treat the application as complete for the purposes of paragraphs (f)(2) and (g) of this section until the borrower is given a reasonable opportunity to complete the application. If the borrower completes the application within this period, the application shall be considered complete as of the date it first became facially complete, for the purposes of paragraphs (d), (e), (f)(2), (g), and (h) of this section, and as of the date the application was actually complete for the purposes of this paragraph (c). A servicer that complies with this paragraph will be deemed to have fulfilled its obligation to provide an accurate notice under paragraph (b)(2)(i)(B) of this section.

(emphasis added).

67. On or about December 9, 2020 Ilowitz submitted the Application to Shellpoint. *See Exhibit 1*.

68. On or about December 21, 2020, Shellpoint contacted Ilowitz to confirm receipt of the Application and advise that Shellpoint required a letter of explanation in order to complete its review of the Application. On or about December 24, 2020, Ilowitz submitted the documents and information requested by and through the December 21, 2020 phone call. *See Exhibit 2*.

69. As Ilowitz submitted all the missing documents requested by and through the December 21, 2020 phone call, the Application was facially complete as of December 24, 2020.

70. Accordingly, within thirty (30) days of December 21, 2020, UWM was to evaluate the Application and send him written notice advising him of UWM's determination of what, if any, loss mitigation options UWM would offer Ilowitz.

71. Instead, UWM waited until April 14, 2021, almost four (4) months after the December 24, 2020 submission, to send Ilowitz correspondence which told him that he would need to submit a new application.

72. UWM's actions in failing to timely evaluate the Application as expressly required by 12 C.F.R. § 1024.41(c)(1), constitutes a clear, separate, and distinct violation of 12 C.F.R. §1024.41.

73. UWM's actions caused Ilowitz to suffer actual damages as further described, *supra*, including but not limited to necessitating the sending of NOE #1 and being forced to retain and pay counsel to submit a new application.

74. UWM's actions are believed to be part of a pattern and practice of behavior in conscious disregard for Ilowitz's rights.

75. As a result of UWM's actions, UWM is liable to Ilowitz for actual damages, statutory damages, costs, and attorneys' fees.

**COUNT THREE: VIOLATION OF 12 C.F.R. § 1024.35(e) AND 12 U.S.C. §§ 2065(k)(1)(C) AND (E)**

**(Failure to properly respond to NOE #1)**

76. Ilowitz restates and incorporates all of his statements and allegations contained in paragraphs 1 through 43, in their entirety, as if fully rewritten herein.

77. A servicer shall not "(C) fail to take timely action to respond to a borrower's requests to correct errors relating to allocation of payments, final balances for purposes of

paying off the loan, or avoiding foreclosure, or other standard servicer's duties[5]… or (E) fail to comply with any other obligation found by the [CFPB], by regulation, to be appropriate to carry out the consumer protection purposes of this chapter" 12 U.S.C. § 2065(k)(1).

78. 12 C.F.R. § 1024.35(a) provides that "[a] servicer shall comply with the requirements of this section for any written notice from the borrower that asserts an error and that includes the name of the borrower, information that enables the servicer to identify the borrower's mortgage loan account, and the error the borrower believes has occurred."

79. Comment 1 of the CFPB's Official Interpretations of 12 C.F.R. § 1024.35(a) provides that "[a] notice of error is submitted by a borrower if the notice of error is submitted by an agent of the borrower.

80. Pursuant to 12 C.F.R. § 1024.35(b)(11), the term "error" refers to any error, not otherwise specified in 12 C.F.R. §§ 1024.35(b)(1) to 1024.35(b)(10), committed in regards the borrower's mortgage loan.

81. 12 C.F.R. § 1024.35(e)(1)(i) provides that a servicer must respond to a notice of error by either:

> (A) Correcting the error or errors identified by the borrower and providing the borrower with a written notification of the

[5] "The Bureau believes that standard servicer duties are those typically undertaken by servicers in the ordinary course of business. Such duties include not only the obligations that are specifically identified in section 6(k)(1)(C) of RESPA, but also those duties that are defined as ''servicing'' by RESPA, as implemented by this rule, as well as duties customarily undertaken by servicers to investors and consumers in connection with the servicing of a mortgage loan. These standard servicer duties are not limited to duties that constitute ''servicing,'' as defined in this rule, and include, for example, duties to comply with investor agreements and servicing program guides, to advance payments to investors, to process and pursue mortgage insurance claims, to monitor coverage for insurance (e.g., hazard insurance), to monitor tax delinquencies, to respond to borrowers regarding mortgage loan problems, to report data on loan performance to investors and guarantors, and to work with investors and borrowers on options to mitigate losses for defaulted mortgage loans." 78 Fed. Reg. 10696, 10739.

correction, the effective date of the correction, and contact information, including a telephone number, for further assistance; or

(B) Conducting a reasonable investigation and providing the borrower with a written notification that includes a statement that the servicer has determined that no error occurred, a statement of the reason or reasons for this determination, a statement of the borrower's right to request documents relied upon by the servicer in reaching its determination, information regarding how the borrower can request such documents, and contact information, including a telephone number, for further assistance.

82. NOE #1 meets the requirements of a notice of error as defined by 12 C.F.R. § 1024.35(a). *See Exhibit 4*.

83. UWM received NOE #1 at the Designated Address UWM designated for the receipt of such notices pursuant to 12 C.F.R. § 1024.35(c). *See Exhibit 4*.

84. Through NOE #1, Ilowitz alleged that UWM committed an error in relation to the Loan pursuant to 12 C.F.R. § 1024.35(b)(11) by either failing to exercise reasonable diligence to obtain a complete Application from Ilowitz as required by 12 C.F.R. §1024.41(b)(1) or by failing to complete the review of the Application from Ilowitz in writing as required by 12 C.F.R. §1024.41(k). See *Exhibit 4*.

85. UWM claimed through the Response to NOE #1 that no errors occurred as alleged through NOE #1 despite admitting that UWM received the Application and supporting documents from Shellpoint. See *Exhibit 5*. UWM then claimed that Ilowitz would be required to submit an entirely new application in order to be considered for a modification.

86. UWM's statement that no errors occurred as alleged through NOE #1 despite admitting its significant delay in responding to the Application evidences their lack

of a reasonable investigation into the errors alleged by and through NOE #1 as UWM waited over (3) months to address the Application. Further, UWM's determination to require Ilowitz to submit an entirely new application as opposed to submit the documents which were allegedly required to complete the review of the application further evidences their lack of a reasonable investigation into the errors alleged by and through NOE #1.

87. A reasonable investigation would have clearly determined that: (1) Ilowitz previously provided all requested documents to Shellpoint; (2) the Application was complete; and (3) UWM failed to exercise reasonable diligence in completing the Application.

88. Moreover, at no point in time through Response to NOE #1 does UWM provide any explanation as to why it waited over (3) months to address the Application.

89. UWM's failure to correct the errors alleged through NOE #1 or to alternatively perform a reasonable investigation of such constitutes clear, separate, and distinct violation of 12 C.F.R. § 1024.35(e).

90. UWM's actions caused Ilowitz to suffer actual damages as further described, *supra*, including but not limited to necessitating of retaining counsel to submit a new application.

91. UWM's actions are believed to be part of a pattern and practice of behavior in conscious disregard for Ilowitz's rights.

92. As a result of UWM's actions, UWM is liable to Ilowitz for actual damages, statutory damages, costs, and attorneys' fees.

**COUNT FOUR: VIOLATION OF 12 C.F.R. § 1024.36(d) AND 12 U.S.C. § 2605(k)(1)(E)**

**[Violations of RESPA]**

**[Failure to properly acknowledge and respond to requests for information]**

93. Ilowitz restates and incorporates all of his statements and allegations contained in paragraphs 1 through 43, in their entirety, as if fully rewritten herein.

94. 12 C.F.R. § 1024.36(a) provides, in relevant part, that a request for information may consist of "any written request for information from a borrower that includes the name of the borrower, information that enables the servicer to identify the borrower's mortgage loan account, and states the information the borrower is requesting with respect to the borrower's mortgage loan."

95. Comment 1 of the Official Interpretations of the CFPB to 12 C.F.R. § 1024.36(a) provides that "[a]n information request is submitted by a borrower if the information request is submitted by an agent of the borrower."

96. 12 C.F.R. § 1024.36(c) provides that: Within five days (excluding legal public holidays, Saturdays, and Sundays) of a servicer receiving an information request from a borrower, the servicer shall provide to the borrower a written response acknowledging receipt of the information request.

97. 12 C.F.R. § 1024.36(d)(1) provides, in relevant part, that

> [A] servicer must respond to an information request by either:
>
> (i) Providing the borrower with the requested information and contact information, including a telephone number, for further assistance in writing; or
>
> (ii) Conducting a reasonable search for the requested information and providing the borrower with a written notification that states that the servicer has determined that the requested information is not available to the servicer, provides the basis for the servicer's determination, and provides contact information, including a telephone number, for further assistance.

98. Furthermore, 12 C.F.R. § 1024.36(d)(2)(i) provides that:

> A servicer must comply with the requirements of paragraph (d)(1) of this section:
>
> (A) Not later than 10 days (excluding legal public holidays, Saturdays, and Sundays) after the servicer receives an information request for the identity of, and address or other relevant contact information for, the owner or assignee of a mortgage loan; and
>
> (B) For all other requests for information, not later than 30 days (excluding legal public holidays, Saturdays, and Sundays) after the servicer receives the information request.

99. A servicer shall not "fail to comply with any other obligation found by the Bureau of Consumer Financial Protection, by regulation, to be appropriate to carry out the consumer protection purposes of this chapter."12 U.S.C. § 2605(k)(1)(E).

100. RFI #1 and #2 each meet the definition of a request for information. *See Exhibits 8, 9*.

101. Ilowitz sent RFI #1 to UWM at the Designated Address and UWM received RFI #1 at the Designated Address on March 4, 2021. *See Exhibit 8*.

102. Ilowitz sent RFI #2 to UWM at the Designated Address and UWM received RFI #2 at the Designated Address on March 4, 2021. *See Exhibit 9*.

103. Pursuant to 12 C.F.R. § 1024.36(c), UWM was to provide written correspondence to Ilowitz acknowledging RFI #1 and RFI #2 "within five days (excluding legal public holidays, Saturdays, and Sundays)" of receiving the information request. That is, UWM was to provide its written correspondence acknowledging the RFI's on or before March 11, 2021.

104. Ilowitz never received any written correspondence from UWM consisting of a acknowledgment to either RFI #1 or RFI #2 on or before the response deadline, and UWM therefore failed to comply with the requirements of 12 C.F.R. § 1024.36(c).

105. Ilowitz incurred fees in having counsel prepare and send NOE #1 on his behalf to UWM at the Designated Address, which would not have been required but for UWM's failure to properly acknowledge RFI #1 and RFI #2.

106. UWM's actions, in failing to timely acknowledge RFI #1 and RFI #2, constitute a willful violation of 12 C.F.R. § 1024.36(d).

107. Pursuant to 12 C.F.R. § 1024.36(d)(2)(i)(A), UWM was required to provide written correspondence to Ilowitz in response to RFI #1 "not later than 10 days (excluding legal public holidays, Saturdays, and Sundays) after the servicer receive[d] the information request", as contained in the RFI, in compliance with the requirements of 12 C.F.R. § 1024.36(d)(1). That is, UWM was required to provide its response on or before March 18, 2021.

108. Ilowitz never received any written correspondence from UWM consisting of a substantive response to RFI #1 on or before the response deadline, and UWM therefore failed to comply with the requirements of 12 C.F.R. § 1024.36(d)(1).

109. Ilowitz incurred fees in having counsel prepare and send NOE #2 on his behalf to UWM at the Designated Address, which would not have been required but for UWM's failure to properly respond to RFI #1.

110. UWM's actions, in failing to timely respond to RFI #1, constitute a willful violation of 12 C.F.R. § 1024.36(d).

111. Pursuant to 12 C.F.R. § 1024.36(d)(2)(i)(B), UWM was required to provide written correspondence to Ilowitz in response to the RFI "not later than 30 days (excluding legal public holidays, Saturdays, and Sundays) after the servicer receive[d] the information request", as contained in the RFI, in compliance with the requirements of 12 C.F.R. §

1024.36(d)(1). That is, UWM was required to provide its response on or before April 19, 2021.

112. Ilowitz never received any written correspondence from UWM containing a complete response to a single one of the requests outlined in RFI #2 on or before the response deadline and UWM therefore failed to comply with the requirements of 12 C.F.R. § 1024.36(d)(1) regarding RFI #2.[6]

113. UWM incurred fees in having counsel prepare and send NOE #3 on his behalf to UWM at the Designated Address, which would not have been required but for UWM's failure to properly respond to the RFI. *See Exhibit 11*.

114. UWM's actions, in failing to provide a complete response to a single item requested through RFI #2 by the respective response deadline, constitute a willful violation of 12 C.F.R. § 1024.36(d).

115. UWM's actions are believed to be a pattern and practice of behavior in conscious disregard for Plaintiff's rights.

116. As a result of UWM's actions, UWM is liable to Ilowitz for actual damages, statutory damages, costs, and attorneys' fees, including, but not limited to incurring costs and fees for the preparation and mailing of NOE #3 which would not have been necessary but for UWM's failure to properly respond to RFI #2. 12 U.S.C. § 2605(f).

## PRAYER FOR RELIEF

**WHEREFORE** Plaintiff Chaim Ilowitz, respectfully requests that this Court enter an order granting Judgment against Defendant United Wholesale Mortgage, LLC as follows

---

[6] UWM eventually provided its "response" through the NOE #2 Response. consisted of a cover letter and the transaction history for the period spanning October 17, 2019 through March 22, 2021. However, even the transaction history was insufficient as it failed to cover the period from June 1, 2019 to October 16, 2019.

a. For actual damages against Defendant as to all allegations contained in Counts One through Four;

b. For statutory damages of Two Thousand Dollars ($2,000.00) against Defendant for each and every violation of 12 C.F.R. § 1024.41 and 12 U.S.C. § 2605(k) as alleged in Counts One through Two;

c. For statutory damages of Two Thousand Dollars ($2,000.00) against Defendant for each and every violation of 12 C.F.R. § 1024.35 and 12 U.S.C. § 2605(k) as alleged in in Count Three;

d. For statutory damages of Two Thousand Dollars ($2,000.00) against Defendant for each and every violation of 12 C.F.R. § 1024.36 and 12 U.S.C. § 2605(k) as alleged in in Count Four;

e. For costs and reasonable attorney fees against Defendant as to all allegations contained in Counts One through Four; and,

f. For all other relief this Court may deem just and proper.

Respectfully submitted,

/s/ Javier L. Merino
Javier L. Merino
DannLaw
372 Kinderkamack Road, Suite 5
Westwood, NJ 07675
201/355-3440
Fax (216) 373-0536
notices@dannlaw.com

**Jury Demand**

Ilowitz hereby requests a trial by jury on all issues, with the maximum number of jurors permitted by law.

/s/ Javier L. Merino

Javier L. Merino
DannLaw